UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

04 11809 EFH CIVIL ACTION NO.

MAGISTRATE JUDGE _____

| | |
|---|---|
| EXGENEX, INC. | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| MICHAEL SORGANI, | )<br>)<br>) |
| Defendant | )<br>) |

RECEIPT # _____
AMOUNT $ 150
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

## VERIFIED COMPLAINT

### PARTIES

1. Plaintiff, Exgenex, Inc. ("Exgenex" or "the Company"), is a New York corporation with a principal place of business at 437 Turnpike Street, Canton, Massachusetts.[1]

2. The Defendant, Michael Sorgani, ("Sorgani"), is an individual residing at 1214 East Mountain Street, Glendale, California.

### JURISDICTION

3. This Verified Complaint and the counts contained herein are brought pursuant to the diversity jurisdiction of this Court under Title 28, Section 1332 of the United States Code and Rule 13 of the Federal Rules of Civil Procedure. The amount in controversy exceeds $75,000 exclusive of interest and costs.

---

[1] Until 2002, when the Company's name was changed, Exgenex was known as Expo International, Inc. (Exgenex and Expo International, Inc. shall collectively be referred to herein as "Exgenex" or "the Company").

{J:\CLIENTS\emp\050608\0100\00453482.DOC;1}

## BACKGROUND

4. Exgenex is in the business of providing lead retrieval, on-line registration and corporate data services to the meeting and trade show industry, which is an extremely competitive business. Specifically, the Company provides full registration and lead retrieval services for events worldwide ranging in size from 500 to 200,000 participants. Exgenex also provides email and lead management services to corporations and organizations focused on enhancing customer services and lead cultivation. The Company supports its clients through internally developed software applications for on-line and off-line registration, surveys, lead collection and management, and email marketing.

5. Exgenex provides services to businesses and organizations located throughout the world, with most of its customers and prospective customers located in the United States including Las Vegas, Chicago, New York, California, Boston, and Atlanta.

6. Approximately 20 to 30% of the Company's service contracts are derived through a bidding process which usually involves the submission of <u>sealed bids</u> to customers and prospective customers. During the bidding process, Exgenex does not know the amounts which its competitors have bid, and its competitors do not know the amount which Exgenex has bid. Having information about a competitor's bidding history, contracts and profit and loss history would provide a company with a significant advantage in bidding for such contracts.

7. The Company's "prospective customers" are not merely entities with whom Exgenex would like to transact business and with whom it has had no previous contact. Rather, they are entities with whom the Company has (a) had significant

contact; (b) developed substantial service and pricing information in the course of making proposals for business; (c) established important personal contacts and relationships; and (d) invested substantial time and money in efforts to obtain their business.

## SORGANI'S EMPLOYMENT WITH EXGENEX

8.  Sorgani began his employment with Exgenex as a Regional Sales Manager in or about June, 2001.

9.  Prior to commencing his employment with Exgenex, and as a condition of his employment, Sorgani and Exgenex entered into an employment agreement, a true and accurate copy of which is attached hereto as <u>Exhibit A</u>. Pursuant to this agreement, Sorgani earned an annual salary of $50,000 and received an annual recoverable draw, or advance, totaling $50,000.

10. As Regional Sales Manager for Exgenex, Sorgani's primary duty and responsibility was to make sales calls to Exgenex's customers and potential customers throughout the United States, including Massachusetts, and at various times during his employment with Exgenex, managing a sales group comprised of between one (1) to three (3) salespeople. Sorgani was also responsible for providing lead retrieval and registration services for Exgenex's customers at tradeshows throughout the United States, when necessary.

11. Sorgani participated in the Company's management and business strategy meetings throughout his tenure at the Company. At these meetings, confidential marketing strategies, customer pricing and Exgenex profit results and forecasts were discussed.

12. When Sorgani was hired by the Company, he brought with him essentially no customers or "book of business."

13. From the time he began working at the Company, Exgenex provided Sorgani with substantial training on the Company's internally developed software applications used in its business, including the Campaign Management application used for on-line and off-line registration, on-line and off-line surveys, lead collection, lead management and distribution, on-line fulfillment and email marketing. Sorgani was also trained to use the applications at customer trade shows and seminars. In addition, Exgenex provided Sorgani with substantial support and resources in order to allow him to effectively and successfully perform his duties, including providing him with access to the Company's former, current and prospective customer databases, customer contracts, pricing strategies and client payment and creditworthiness histories, day-to-day customer support by the client services group, and introducing him to key customer contacts.

14. During his employment, Sorgani was exposed to and entrusted with confidential information relating to the Company's business, including but not limited to the following: (a) pricing information regarding service pricing, including pricing strategy, customer pricing groups and customer special pricing; (b) financial information, including information regarding Exgenex's gross revenue and revenue by each particular service offered, and profits; (c) information regarding Exgenex's marketing, bidding and service programs and strategies, service call frequencies, and service commissions and incentives; (d) information regarding the Company's customers, including the identity of key customers and customer contacts, creditworthiness, contracts, credit lines, service history and preferences, and highly confidential information regarding the current and

forecasted financial health of its customers; and (e) information regarding the vendors and manufacturers which supply products to Exgenex, including contact names, pricing and costs, payment terms, and total purchases from each supplier. Exgenex protected its business information, by, among other things, informing employees of the confidentiality of such information and limiting access to such information.

15. During the first week of his employment with Exgenex in early June, 2001, Sorgani traveled from California to Exgenex's offices in Canton, Massachusetts in order to meet with various senior managers, including Gary Fornari, his supervisor, and Exgenex's president, Stephen Saber, and to sign employment documents.

16. While at Exgenex's corporate offices in Massachusetts, Sorgani executed an agreement entitled "Intellectual Property Covenants" (the "Covenants"), a true and accurate copy of which is attached hereto as Exhibit B.

17. Pursuant to Paragraph 4 of the Covenants, Sorgani acknowledged that "in the course of his . . . employment by [Exgenex], he will have access to the trade secrets and Confidential information described in [the Covenants] and that he will be intimately involved in developing and maintaining [Exgenex's] goodwill."

18. Accordingly, Sorgani agreed to abide by the non-competition clause set forth in the Covenants which provides:

> (a) during the term of this Agreement and for a period of three (3) years after [Sorgani] has ceased to be employed by [Exgenex] for any reason, [Sorgani] shall not, without the prior written consent of the duly-authorized officer of [Exgenex], directly or indirectly;
> (1) engage in, or
> (2) assist or have an interest in. . ., or
> (3) enter the employment of . . . any person, firm, partnership, association, corporation, business organization, entity, or enterprise in the United States that is, or is to become, directly or indirectly, engaged in any business in any area or territory in which

> [Sorgani] worked or provided services...or in any area or territory which [Exgenex] offers its services or products...which competes with or is substantially similar to any business that [Exgenex] has operated....

19. Due to the importance of these matters to Exgenex and its customers, the Covenants provide that in the event of a violation of any of the restrictions or covenants set forth therein, Exgenex has a specific right to enforce the provisions of the Covenants and is entitled to an injunction to restrain Sorgani from violating the provisions and to enforce such provisions. See Exhibit B, ¶ 5.

20. The Agreement is intended to protect the Company's trade secrets and confidential business information and the goodwill which Exgenex has developed with its customers. The Agreement's three-year duration is necessary to enable Exgenex to develop and establish a strong relationship between Sorgani's replacement and the customers he/she is assigned to serve and who had previously been serviced by Sorgani.

21. Sorgani continued to work as the Regional Sales Director from June, 2001 through December, 2001, calling on Exgenex's existing clients, developing new clients for Exgenex, and attending trade shows throughout the United States.

22. On January 11, 2002, as a condition of his continued employment with Exgenex, Sorgani and Exgenex executed a new employment agreement (the "Agreement"), a true and accurate copy of which is attached hereto as Exhibit C.

23. Pursuant to the Agreement, Sorgani's title was changed to National Account Executive. His compensation remained the same with an annual salary of $50,000 and a recoverable draw of $50,000. See Exhibit C. The Agreement further states that Sorgani's commissions would be paid in accordance with Exgenex's commission policy (the "Policy") which was enclosed with the Agreement. Id.

24. According to the terms of the Policy, commissions were paid to eligible Exgenex employees at a rate of five (5%) percent for new registrations and one and one-half (1.5%) percent on renewal registrations. Additionally, Paragraphs 2 and 3 of the Policy provide that commissions were paid to Exgenex employees in two (2) parts: Fifty (50%) percent of the commission amount was paid in the month following Exgenex's receipt of a signed contract with a customer, and the remaining fifty (50%) percent was paid after Exgenex received the entire "show fee" from its customer (the "second payment"). See Exhibit C, ¶¶ 2-3. In order to receive any second payment, the Policy requires that an employee be employed by Exgenex. See Exhibit C, ¶ 4.

25. The Policy also sets forth Exgenex's policies and procedures with respect to recoverable draws. As set forth in Paragraphs 8 and 9 of the Policy, Exgenex would offset any draws paid to an employee in advance by any commissions the employee earned, and, when an employee's employment with Exgenex terminated, the employee was required to reimburse Exgenex to the extent that the advanced draw monies exceeded commissions owed to the employee. See Exhibit C, ¶¶ 8-9.

26. After executing the Agreement and acknowledging receipt and acceptance of the Policy by initialing each page, Sorgani continued to work for Exgenex, calling on and servicing Exgenex's customers and potential customers throughout the United States at their offices and also at trade shows at which the customers were utilizing Exgenex's sales lead retrieval hardware and software.

27. In the two (2) years after signing the Agreement, Sorgani made trips to Exgenex's Canton, Massachusetts corporate office in order to meet with his supervisors

and product development and support providers, as well as to handle other administrative matters.

28.     During this time period, Exgenex continued to make a substantial investment in Sorgani as a sales representative by, among other things, compensating him; reimbursing him for all business expenses; and providing him with the benefit of Exgenex's advertising, goodwill and name recognition, promotional marketing and sales support, customer accounts, customer referrals, and customer leads to new accounts generated by Exgenex's marketing efforts.

29.     By virtue of Sorgani's continuous employment at Exgenex, Sorgani gained access to the records and documents of the Company, the confidential information contained therein, and especially the identity of Exgenex's customers, including contact names and addresses, together with an intimate knowledge of Exgenex's lead retrieval hardware and software products.

## SORGANI'S RESIGNATION

30.     Sorgani voluntarily terminated his employment with Exgenex on or about July 22, 2004, and, upon information and belief, subsequently began or will begin employment with Compusystems, Inc., a direct competitor of Exgenex.

31.     Having knowledge of and inevitably using the Company's confidential information (as described above) and having established, on Exgenex's working time and at its expense, goodwill with its customers, Sorgani will be able to gain immediate access to the Company's customers and prospects, quote prices based on Exgenex's abilities, limitations and costs, and gain an unfair competitive advantage for his new employer which it could not and would not have if Sorgani had not been employed by Exgenex.

Sorgani will also be able to take advantage of, and diminish, the Company's goodwill with its clients and prospects.

32. When Sorgani notified Exgenex of his pending departure, Exgenex's Chief Financial Officer, Robert Scott, in accordance with the Policy, calculated the difference between payment commissions still owed to Sorgani and Sorgani's outstanding recoverable draw balance.

33. As of July 22, 2004, Sorgani was entitled to an additional $57,118 in payment commissions and had an outstanding recoverable draw balance of $158,333.33. Shortly thereafter, Robert Scott made a demand that Sorgani pay Exgenex the difference between commissions Sorgani was owed and his outstanding recoverable draw debt. Sorgani refused to pay Exgenex the monies he owes it.

34. Therefore, and also pursuant to the terms of the Agreement, monies due Sorgani at the time of his termination were applied to his outstanding debt to Exgenex, reducing the balance Sorgani owes Exgenex to $99,291.99.

35. To date, Sorgani has still neglected, refused and failed to reimburse Exgenex for his remaining recoverable draw balance.

## COUNT I
(Breach of Contracts)

36. Exgenex repeats and realleges the allegations contained in Paragraphs 1 through 35 as if fully set forth herein.

37. Based on the facts set forth herein, Sorgani has breached his Agreement with Exgenex by neglecting, refusing and failing to pay Exgenex the difference between commissions he earned while employed by Exgenex and his recoverable draw balance.

38. Based on the facts set forth herein, Sorgani's current employment with a company which directly competes with Exgenex constitutes a breach of Paragraph 4 of the Covenants.

39. As a consequence of the foregoing, Exgenex has suffered and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Exgenex respectfully requests that this Court:

(a) Enter judgment in favor of Exgenex on its breach of contract claims against Sorgani; and

(b) Order such further relief as this Court deems just and proper, including but not limited to interest, costs, and attorneys' fees.

## COUNT II
### (Conversion)

40. Exgenex repeats and realleges the allegations contained in Paragraphs 1 through 39 as if fully set forth herein.

41. Based on the conduct set forth herein, Sorgani has converted monies paid to him by Exgenex in the form of recoverable draws for his own purpose and use. Specifically, Sorgani has possession of and has refused to transfer back to Exgenex the difference between commissions he earned and recoverable draws paid to him by Exgenex during the course of his employment with Exgenex.

42. Sorgani has no right to retain Exgenex's money, and his retention of said monies following Exgenex's demand for the same is unlawful and constitutes conversion.

43. As a result of Sorgani's conversion, Exgenex has suffered damages in an amount to be determined at trial.

WHEREFORE, Exgenex respectfully requests that this Court:

(a) Enter judgment in favor of Exgenex on its conversion claim against Sorgani; and

(b) Order such further relief as this Court deems just and proper, including but not limited to interest, costs, and attorneys' fees.

## COUNT III
### (Injunctive Relief)

44. Exgenex repeats and realleges the allegations contained in Paragraphs 1 through 43 as if fully set forth herein.

45. Exgenex has developed substantial goodwill in the tradeshow industry with its customers and prospective customers through the Company's efforts and upon which Exgenex derives repeat and new business.

46. Unless Sorgani is enjoined from breaching Paragraph 4 of the Covenants, Exgenex will be irreparably harmed by the actual and inevitable disclosure and/or use of its confidential and proprietary business information, loss of customers, harm to its goodwill, and economic loss, which is unascertainable at this time.

WHEREFORE, Exgenex respectfully requests that this Court:

(a) Issue an injunction enjoining Sorgani from directly or indirectly assisting or having an interest in, or entering the employment of any person, firm, partnership, association, corporation, business organization, entity, or enterprise in the United States which competes with or is substantially similar to any business that Exgenex has operated or had under consideration in a planning or development stage during the 180 day period immediately prior to Sorgani's ceasing to be employed by Exgenex;

(b)   Issue an injunction enjoining Sorgani from disclosing or using any confidential or proprietary business information of Exgenex; and

(c)   Grant such other relief as this Court deems just and proper, including but not limited to, awarding interest, costs, and attorneys' fees.

EXGENEX, INC.

By its Attorneys,

_____
David M. Felper (BBO#162460)
Christine S. Collins (BBO #639293)
Bowditch & Dewey, LLP
311 Main Street
P.O. Box 15165
Worcester, MA  01615-0156
(508) 926-3452

Dated:   August 18, 2004

## VERIFICATION

I, Stephen Saber, President of Exgenex, Inc. located at 437 Turnpike Street, Canton, Massachusetts 02021-1411 and the Plaintiff in the above action, state that the facts set forth in the foregoing Verified Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

*/s/ Stephen Saber*
Stephen Saber